## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| FAY L. RINEHART-BANASZAK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CAUSE NO. 3:11-CV-12 PS |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Fay L. Rinehart-Banaszak developed a blood clot in her legs which led to an eight day hospitalization in January 2006. Her condition, which in medical parlance is known as deep vein thrombosis or DVT, can be very painful. Based largely upon the persistent pain that the DVT causes her, Rinehart filed an application for the Social Security disability benefits. An administrative law judge denied the request, concluding that Rinehart could work subject to certain limitations. Rinehart now requests that I reverse the ALJ's decision outright, or in the alternative, remand with instructions to the ALJ. For the following reasons, I am affirming the ALJ's decision.

### Factual Background

The record in this case derives from three sources: Rinehart's medical records; the testimony at the administrative hearing; and the ALJ's opinion. Although it's a tedious exercise, I'll recount the factual background in some detail drawing upon all three sources because doing so is necessary to fully evaluate Rinehart's claim.

### Medical Records

Rinehart's medical records include a combination of treatment notes from her treating

physicians and state agency physicians, as well as correspondence from Rinehart's treating physicians that were submitted in support of her disability claim.

Rinehart's treatment for DVT began on January 1, 2006, when she was admitted to the Memorial Hospital of South Bend with abdominal pain, nausea, and significant swelling of lower extremities. [Tr. at 204-05.] Rinehart was diagnosed with DVT, and later discharged on January 8, 2006 in satisfactory condition. [Tr. at 204.] Dr. Russell Midkiff examined her on January 16, 2006 and reported continued DVT on the left side, but that the DVT on the right side had largely resolved itself. [Tr. at 201-02.] When Dr. Midkiff examined Rinehart again on February 7, 2006, he noted her "significant . . . improvement" and that there was no new area of DVT. [Tr. at 200.]

On February 7, 2006, Rinehart began seeing a hematologist, Dr. Bilal Ansari, for follow up treatment. His first report stated that her swelling was minimally reduced, and that Rinehart told him that her pain got worse with increased activity but that it improved when she lays down. Dr. Ansari refilled her Percocet prescription and continued her on Lovenox. [Tr. at 253.] On April 7, 2006 Rinehart returned to Dr. Ansari with some "bilateral swelling in the lower extremities" and "complaining of a little bit of pain" in her left lower extremity. [Tr. at 251.] An ultrasound done that day was negative for DVT. *Id.* A month later Rinehart saw Dr. Ansari for a follow up and she denied "any edema [swelling] in the lower extremities," but she did report a small amount of pain around her left knee, which was more intense after sitting for a prolonged period of time. [Tr. at 250.] In her June, 2006 follow up visit with Dr. Ansari, Rinehart reported that she's been feeling well except for minor pain, and Dr. Ansari reported that there was no swelling. [Tr. at 255.] Similarly, in September 2006, Dr. Ansari stated that Rinehart was "doing well" and that there was a only a small amount of swelling "in left lower extremity." [Tr. at

2

249.] Finally, on November 14, 2006, Dr. Ansari reported that, although Rinehart reports having some pain in left lower extremity, her last CT scan showed "only a residual . . . thrombus" on the left side, and "[n]o edema (swelling) noted at this time." Dr. Ansari decided to refer Rinehart to Dr. Todd Graham for pain management. [Tr. at 248.]

Rinehart has been consistently visiting Dr. Graham and other physicians at his office since Dr. Ansari's referral. [Tr. at 287-91.] After her first visit, Dr. Graham reported that Rinehart complained of increased groin pain when she lays down, but that she was in "no acute distress." [Tr. at 291.] Rinehart reported her pain as a 5 on a scale of 1 to 10. *Id.* Dr. Graham found that Rinehart had good strength in her lower extremities despite her chronic leg pain. Dr. Graham continued her on Percocet and Lyrica . [Tr. at 291.] In a follow up visit a couple of weeks later, Dr. Graham noted a left lateral protrusion at the L3-4 disc space, but otherwise no evidence of spinal stenosis. Graham continued her on the same medication. [Tr. at 290.]

The following month, on January 19, 2007, Rinehart followed up with Dr. Ansari, and he noted some swelling on the left side that causes her "some pain," some swelling in her left lower extremity, but that she didn't report any pain at the time of the visit. Dr. Ansari kept her on anticoagulation drugs to allay Rinehart's concern of the clot returning. [Tr. at 297-98.] That day Rinehart also visited Dr. Graham, where he discussed chronic pain management with her. Dr. Graham noted that Rinehart described persistent pain in the left groin and anterior thigh, and Rinehart underwent an MRI that showed degenerative changes in the L3, L4 space of her spine. Dr. Graham suggested a steroid injection but she declined. He prescribed her up to four Percocet per day and 30 mg of Cymbalta. [Tr. at 289.]

Pursuant to her disability claim, Rinehart visited Dr. Thomas Barbour of the Indiana

Disability Determination Bureau. Rinehart told Dr. Barbour that she was unable to continue with normal activities at home and work because of left groin pain. [Tr. at 259-60.] He noted that Rinehart said the pain was present every day and it worsened with activity. He acknowledged that her work involves sitting, which she can't do because of the pain, and that she can't complete light housework on a consistent basis for the same reason. [Tr. at 259.]

After Dr. Barbour conducted an exam, he reported that she walked slowly with a limp favoring the left leg, and had mild to moderate difficulty getting on and off the examination table. He further noted that her left groin was very tender, and that she had a minimal amount of swelling at the ankles. She was able to walk on her heels and toes on the right side, but not the left, was unable to hop on left side or tandem walk, was able to hop on right, and that she was not able to squat. Dr. Barbour's impression was that her prognosis for improvement was poor, and that her problem continues to interfere with daily activities. [Tr. at 260.]

Using Dr. Barbour's conclusions, Dr. M. Ruiz, a state agency physician, determined Rinehart's residual functional capacity. She concluded that Rinehart had the following external limitations: (1) she can occasionally lift a maximum of 20 pounds at a time; (2) she can frequently lift a maximum of 10 pounds at a time; (3) she can stand or walk for a total of 6 hours in an 8 hour workday; (4) she can sit with normal breaks for a total of 6 hours on an 8 hour workday; and (5) she can push or pull without limitation. In support, Dr. Ruiz stated that Rinehart has a "slow limping gait," "No AD," "mild to moderate tenderness of abdomen and groin," "normal strength except at L LE which is mildly reduced." [Tr. at 280.] Dr. Ruiz listed the following postural limitations: (1) she can occasionally climb, but never ladders, rope or scaffolds; and (2) she can never balance, but she can occasionally stoop, kneel, crouch, and

4

crawl.  Finally, as to Rinehart's symptoms, Dr. Ruiz stated that "the claimant's allegations and contentions regarding the nature and severity of the impairment-related symptoms and functional limitations are found to be partially credible. . . the contentions regarding the severity of, and the related functional restrictions, are not supported."  [Tr. at 279-86.]

That was the most recent state agency evaluation, but Rinehart's treatment continued and the notes do indicate improvement.  For example, on April 16, 2007, Rinehart had a follow up visit with Dr. Graham, where she reported left groin and thigh pain although the pain was adequately controlled with medication.  He also noted that Rinehart reported discomfort when sitting for prolonged periods. [Tr. at 288.]  Rinehart continued to improve, because on her May 1, 2007 visit to Dr. Ansari, he noted only trace edema in the lower extremity.  Dr. Ansari went as far as to say that her "pain is much improved, unchanged.  She is able to walk.  She is well anticoagulated at this time." [Tr. at 295-96]

But just three months later, in a letter written to Rinehart's attorney, Dr. Ansari's opinion turned more gloomy.  In the letter, Dr. Ansari stated that Rinehart has chronic damage from the clot "that results in quite a bit of discomfort where she is unable to have any prolonged activity. She can definitely not entertain any prolonged standing.  Even when she is doing her desk job and her legs are touching the floor, she has quite a bit of discomfort at the end of the day."  He also stated that he felt "that this is interfering in her activities of daily life as well as in her well being and it is affecting her psychosocially." [Tr. at 302.]

Yet a day later, Dawn Hoover from Dr. Graham's office examined Rinehart, noting that Rinehart continued to have pain in the left groin area, but "no acute distress" and a full range of motion in her left hip.  [Tr. at 332.]

5

Pursuant to her counsel's request, on August 13, 2007, Dr. Graham wrote a letter about Rinehart's condition.  He stated that he had "not assigned any specific work restrictions for this patient," but that he felt "it would be difficult for her to perform sustained eight hour per day work of any type, including sedentary work....Her prognosis is stable; however, her pain complaints and need for opioid pain medication are anticipated to be chronic issues." [Tr. at 300.] But soon thereafter, on August 30, 2007, Dr. Hoover met with Rinehart, reporting "no acute distress," but continued left groin and leg pain.  [Tr. at 331.] Dr. Hoover met with her again on October 4, 2007 and November 29, 2007, and her report was the same.  [Tr. at 330, 328-29.]

Rinehart seemed fine for a while, but on April 16, 2008 she went to the emergency room reporting left flank pain.  Dr. Robert King reported that Rinehart didn't have acute distress and ruled out any signs of residual or recurrent DVT.  He diagnosed left flank pain and prescribed medication.  [Tr. at 388-90.]  Afterwards, on April 17 and 19, Rinehart visited Dr. Graham's office and was treated by Sandra Martin, who continued the same prescription.  [Tr. at 322-23.] Rinehart returned to the hospital on June 20, 2008, where she was diagnosed with gallstones. [Tr. at 386.]

On December 9, 2008, Rinehart visited Dr. Graham's office.  Dr. Martin noted chronic persistent left groin pain and that Rinehart was having "some difficulty when she sits for a long period of time and when she stands for [sic] long period of time."  [Tr. at 320.] But she also stated that Rinehart has good range of motion and her strength was a five out of five.  A month later, on January 9, 2009, Dr. Ansari wrote another letter on Rinehart's behalf, stating that "it would be difficult for her to work a steady eight hour shift." [Tr. at 336.]

6

On March 9, 2009, Dr. Martin saw Rinehart again, reporting that Rinehart was still tender in the left groin area and has difficulty when sitting or standing for long periods of time.  Again, she noted that Rinehart had reasonable and functional range of motion in lower extremities, and her strength ranked at a five out of five. [Tr. at 319.] Then, on April 1, 2, and 13, 2009, Rinehart visited Dr. Laura Hannon for her left flank pain and dizziness.  In each treatment note, Dr. Hannon stated that Rinehart had "no edema, cyanosis or bruising." [Tr. at 357-59.] Shortly after the hearing before the ALJ, Rinehart had an appointment with Dr. Ansari, who noted "[m]inimal left lower extremity edema, unchanged."  [Tr. at 401.]

After the hearing but before the ALJ issued his opinion, Dr. Hannon and Dr. Graham both wrote letters on Rinehart's behalf.  On November 23, 2009, Dr. Hannon wrote that "[d]ue to the chronic nature of her conditions and the medications she takes to manage them, I feel it would be difficult for her to carry out a regular 8 hour work day doing any type of work.  She suffers from chronic pain and swelling in her legs as well as situational depression as a result of her medical problems." [Tr. at 403.]  And on November 24, 2009, Dr. Graham wrote that Rinehart "continues to experience significant functional impairment related to the pain.  She will require medications for an indefinite time period."  [Tr. at 108.] Dr. Graham didn't list any specific restrictions.

**Testimony at the Hearing**

The ALJ heard testimony from Rinehart, her daughter Ashley Montague, and vocational expert Dr. Leonard Fisher.  Rinehart testified that she's 48 years old, 5 foot 8, 180 pounds, unmarried, and lives with her boyfriend.  She completed high school, took some college classes, but doesn't have a degree beyond high school.  Rinehart stated that she previously worked at

7

Hydro Aluminum, and before that she worked at National Steel, where she was an inside sales rep. Prior to that, she was a school secretary.  Rinehart testified that she could not do the inside sales job now because of her medications, and because she has a hard time sitting or standing for any period of time.  She stated that she is in constant pain and that sometimes it's tolerable but other times she can't stand it.  She stated that "it just feels like somebody's taking a knife and just jabbing me here, and it'll shoot all the way down to the inside of my leg."

Rinehart also talked about the effect of the medications she takes for pain management. She stated that she takes 60 to 90 mg of morphine and Percocet every day, and as a result she gets sleepy and has a hard time driving.  With respect to work, Rinehart said that she can sit and work for 20 or 30 minutes before the pressure gets too great, and that she can walk for 15 to 20 minutes at a time, and stand for about 30 minutes at a time.

As to her day-to-day activities, Rinehart said that most of the day she lays down, but on weekends she tries to go grocery shopping with the help of  her daughter.  Although she has a hard time, she gets dressed by herself.  Rinehart stated that her boyfriend does the cooking and her daughter has to help her with her checkbook because she has difficulty concentrating. Rinehart concluded by saying that sometimes she has two, three, or four good days in a row but then recently she had eight days of bad pain.  [Tr. at 41-42.]

Then Rinehart's daughter Ashley testified.  She stated that, before the blood clot, Rinehart was on the go constantly.  Since the blood clot, however, her mother complains of pain every day.  She stated that she helps her mother with her laundry, the dishes, and balancing her checkbook.  [Tr. at 42-44.]

The final witness was Dr. Leonard Fisher, a vocational expert.  Fisher testified that

8

Rinehart's previous job in inside sales is considered light work.  He further noted that  Rinehart previously worked as a school secretary from August 1993 to June 1999.  Dr. Fisher stated that, based on the suggested limits listed within the state agency physician's assessment, Rinehart was capable of performing either of these prior jobs. [Tr. at 46.]

### Summary of the ALJ's Decision

On December 8, 2009, the ALJ issued a decision denying benefits.  At Step One of the disability evaluation process, the ALJ found that Rinehart met the insured status requirements of the Social Security Act, and she hasn't engaged in substantial gainful activity since January 1, 2006, the alleged onset date.

At Step Two, the ALJ concluded that Rinehart has the following severe impairments: "a history of deep vein thrombosis with residual left lower extremity pain and chronic abdominal pain.  20 C.F.R. § 404.1520 (c) and 416.920(c)."  As to Rinehart's depression, the ALJ concluded that her depression is not a severe impairment, based on medical and other evidence in the record.

At Step Three, the ALJ concluded that Rinehart doesn't have an impairment or combination of impairments that meets or medically exceeds one of the listed impairments and so he went on to determine Rinehart's residual functional capacity ("RFC") as follows:

> [L]ight work as defined in 20 CFR 404.1567(b) and 416.967(b) and can lift/carry and push/pull twenty pounds occasionally and ten pounds frequently; can stand and walk in combination for about six hours but can work only at occupations which do not require standing or walking for more than an hour at a time; can sit for about six hours; can only work occupations that do not require climbing and which require only occasional balancing, stooping, kneeling, crouching or crawling; and cannot work at occupations which require working at unprotected heights, ambulating on slick surfaces or operating hazardous moving machinery.

[Tr. at 20-21.] To justify the RFC, the ALJ reviewed testimony from the hearing, and concluded

9

that the "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limited effects of these symptoms are not consistent with or fully supported by the medical and other evidence of record." [Tr. at 22.]

In support, the ALJ reviewed the record in great detail.  First, the ALJ described the records of Rinehart's treating physicians, starting with Dr. Ansari.  He described Dr. Ansari's August 1, 2007 letter noting that she "definitely cannot do any prolonged standing and that even when sitting she had quite a bit of discomfort at the end of the day."  But he also noted Dr. Ansari's February 14, 2006 letter where he noted that the clot had been resolved and she had only trace edema in extremities; his November 14, 2006 letter noting only mild pain on left lower extremity, and no edema; and the January 2, 2007 treatment note from Ruth Conley from Dr. Ansari's office reporting no pain in lower extremities.

Then the ALJ described Dr. Graham's treatment.  He acknowledged Dr. Graham's generally negative examination findings but that Dr. Graham didn't suggest any specific work limitations.  In particular, the ALJ described Graham's April 16, 2007 treatment note where he reported that Rinehart was taking Percocet four times a day for severe groin and knee pain with adequate pain control, that Rinehart experienced increased discomfort when she sat for long periods, but that Rinehart was encouraged "to continue to ambulate" without specific instructions. [Tr. 22.]  The ALJ also described Dr. Graham's August 13, 2007 letter, where he didn't list any specific work restrictions, but nonetheless stated that Rinehart was "severely disabled" and that it would be difficult for her to perform sustained work eight-hours a day. [Tr. 22.] However, the ALJ wasn't buying that description of Rinehart's condition because it could

10

not be squared with other of Dr. Graham's records. [Tr. 23.]

The ALJ also described Rinehart's most recent treatment record from Dr. Graham, from March 9, 2009.  In it, Dr. Graham reported that Rinehart was stable on Neurontin, Avinza, and Percocet, she was tender in left groin area with light palpitation, she had some difficulty when sitting or standing for long period, but she had a reasonable and functional range of motion in lower extremities with 5 of 5 strength and no neurofocal deficits. [Tr. 23.]

Finally, the ALJ described some post-hearing letters that he received from Rinehart's medical providers.  But the ALJ viewed those after-the-fact letters with some skepticism because they were contradicted by the doctor's own treatment notes.  For example, the ALJ noted the November 19, 2009 letter from Dr. Ansari stating that Rinehart had chronic pain and required medication.  But the ALJ then noted that Dr. Ansari's own recent records belied that assertion. [Tr. 23].  What's more, as was pointed out by the ALJ, Dr. Ansari gave Rinehart no work-related limitations.  Second, the ALJ made note of Dr. Hannon's post-hearing letter of November 29, 2009 where she stated that Rinehart suffered from chronic pain and swelling in legs.  But once again, the ALJ pointed out that this-after-the fact evaluation was belied by Dr. Hannon's own records. [Tr. 23]. Finally, ALJ described Dr. Graham's November 24, 2009 letter, noting that it didn't contain any suggested work limitations. *Id.*

In sum, the ALJ acknowledged that treating physicians' opinions are typically controlling, but concluded that "most of the treatment records are contradictory to these assertions and indicate that the claimant is not reporting pain or that her pain is controlled with medication and that there is no swelling in her extremities (Exs 9F, 10F, 13F, and 16F); no indication of an additional episode of DVT." [Tr. at 24.] The ALJ therefore concluded that

11

Rinehart can perform past relevant work as an inside sales representative and a school secretary because this work does not require the performance of work-related activities precluded by the RFC.  [Tr. at 25.]

### Discussion

Unless there is an error of law, the Court will uphold the Commissioner's findings of fact if they are supported by substantial evidence in the record.  *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Even if reasonable minds could differ as to the appropriate conclusion, as long as the ALJ's decision is supported by substantial evidence, it should be upheld.  *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

An applicant for disability benefits must establish the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing any kind of gainful employment that exists in the national economy, considering her age, education, and work experience.  *Id*. § 423(d)(2)(A).

There is a five-step inquiry to determine whether an applicant is disabled:  (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work given her residual functional capacity; and (5) whether the claimant is capable of performing any work in the national economy.  *Dixon v. Massanari*, 270

F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520.  A claimant will automatically be found

disabled if he satisfies Steps One, Two and Three.  But "if a claimant satisfies Steps One and

Two, but not Three, then she must satisfy Step Four."  *Knight v. Chater*, 55 F.3d 309, 313 (7th

Cir. 1995); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (citation omitted).  The initial

burden in Steps One through Four is on the plaintiff, and the burden shifts to the Commissioner

only at Step Five.  *Clifford*, 227 F.3d at 868 (citing *Knight*, 55 F.3d at 313).

Rinehart contends that the Commissioner erred in three ways: (1) at Step Two, by failing

to classify her degenerative disc disease as a severe impairment; (2) at Step Four, in determining

Rinehart's residual capacity without crediting the opinions of her treating physicians and instead

crediting the opinion of agency physicians; and (3) by failing to give full credit to Rinehart's

account of her pain.  I'll address her arguments in turn.

## 1.        Degenerative Disc Disease

Rinehart contends that the ALJ failed to note her degenerated disc in his step two severe

impairment analysis.  She argues that it was an error because the degenerated disc caused

significant pain, adding to the damage from the deep vein thrombosis.

As outlined above, at step two of the disability evaluation process, the ALJ determines

whether the claimant has a severe impairment or combination of impairments.  20 C.F.R.

§ 404.1520(a)(4)(ii).  A severe impairment is an impairment or combination of impairments that

significantly limits the claimant's physical or mental ability to perform basic work activities.  20

C.F.R. § 404.1520(c), 404.1521.  Once the ALJ determines that the claimant has a severe

impairment or combination of impairments, the ALJ continues on to the remaining steps of the

evaluation process.  20 C.F.R. § 404.1523.

13

The ALJ didn't make a finding as to the degenerative disc, but this was not a reversible error for two reasons.  First, Rinehart does not cite to any evidence in the record – and I could not find any on my own – that her degenerative disc issue in any way contributed to Rinehart's inability to work.  Although Dr. Graham noted the degenerative disc, he didn't state that the impairment would limit her ability to work, or that it would contribute to her other difficulties. [Tr. at 289-90, 300.] For example, on August 13, 2007, Dr. Graham wrote to Rinehart's attorney's, and he mentioned that her 2006 MRI "was notable for an L3-L4 left lateral disk protrusion," but he also had "not assigned any specific work restrictions for this patient," and only mentioned the pain she was experiencing without noting the disc issue specifically.  [*Id.*] Rinehart points to no other evidence in the record related to the degenerated disc.  Nothing in Dr. Graham's letter or treatment notes suggest that the degenerated disc constitutes a severe impairment, so I see no error in the ALJ's failure to make that conclusion.  *See* Social Security Ruling 96-7p, 1996 WL 374186 (1996).

Second, even if the degenerated disc qualified as a severe impairment, the ALJ's failure to designate it as such would be harmless because the ALJ moved on to steps three and four anyway.  When an ALJ erroneously finds an impairment "not severe," such an error is "not reversible as long as the ALJ finds other severe impairments and continues with the five-step evaluation process."  *Brown v. Astrue*, 2009 WL 722299, at *10 (S.D. Ind. 2009); *Maziars v. Sec'y of Health and Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see Taylor v. Schweiker*, 739 F.2d 1240, 1243 n.2 (7th Cir. 1984) (referring to step two of the process as "an initial screening device"); *see also Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003) (noting that the doctrine of harmless error applies to judicial review of administrative decisions).  This makes

14

sense, given that when the ALJ determines a claimant's RFC, the ALJ must consider "limitations and restrictions imposed by all of an individual's impairments, even those that are not severe." Social Security Rule (SSR) 96-8p, 1996 WL 374184, at *5 (1996). So any error at the Step Two was harmless.

## 2.    ALJ's Determination of Rinehart's RFC

The second issue Rinehart cites as an error is the ALJ's RFC. Rinehart contends that the ALJ's conclusion did not give proper weight to her treating physicians' evidence. But because the ALJ's determination of Rinehart's RFC was supported by substantial evidence, I do not find an error.

The RFC is "an administrative assessment of what work-related activities an individual can perform despite her limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The ALJ determines the RFC, not the treating physicians. SSR 96-5p, 1996 WL 374183, at *4 (1996) ("[A]n RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record . . . ."). However, "[a] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); 20 C.F.R. §§ 404.1502, 416.902, 404.1527, 416.927.

The ALJ established Rinehart's RFC after reviewing the medical records from Rinehart's treating physicians, and concluding that the treating physicians' opinions didn't warrant controlling weight. In reaching this conclusion, the ALJ acknowledged that treating physicians' opinions typically receive controlling weight, but then noted the following instances where her treating

physicians' records didn't support a disability finding:

- Dr. Ansari's January 2, 2007 note that Rinehart did not have pain in her lower extremities, and no edema, cyanosis, or jaundice. [Tr. at 22.]

- Dr. Graham's August 13, 2007 note stating that he did not give Rinehart specific work restrictions, but stating that it would be difficult for her to perform sustained eight hour work days. [Tr. at 22-23.]

- Rinehart's April 1, 2009 visit to the Memorial Hospital of South Bend that didn't show evidence of deep vein thrombosis. [Tr. at 23.]

- Dr. Graham's March 9, 2009 report that Rinehart was stable on Neurontin, Avinza, and Percocet, she had some difficulty sitting or standing for a long period of time, but she has reasonable and functional range of motion in her lower extremities. [Tr. at 23.]

- Dr. Ansari's July 13, 2009 note that Rinehart has only minimal lower leg extremity edema. [*Id.*]

- Dr. Hannon's November 29, 2009 letter stating that it would be difficult for Rinehart to carry out a regular work day, and that Rinehart suffered from chronic pain and leg swelling, which is inconsistent with Dr. Hannon's prior treatment notes that Rinehart did not have leg swelling. [Tr. at 23.]

Based on this review, the ALJ concluded that "most of the treatment records . . . indicate that the claimant is not reporting pain or that her pain is controlled with medication and that there is no swelling in her extremities." [Tr. at 24.]

Next the ALJ turned to the conclusions of the state agency physicians, Dr. Barbour and Dr. Ruiz, neither of which concluded that Rinehart was disabled. Dr. Ruiz's determination was cursory and not based on treatment, but the ALJ didn't give it controlling weight either. In her report, Dr. Ruiz relied on Dr. Barbour's report, who observed that Rinehart had a slow, limping gait, no assistive device, mild to moderate tenderness of the abdomen and groin, normal strength, and normal grip, fine finger manipulation, and range of motion. [Tr. at 24.] Then, the ALJ didn't simply adopt Dr. Ruiz's suggested RFC; he also prohibited her from standing or walking for more than one hour

16

at a time during her workday. [Tr. at 25.]

Nonetheless, Rinehart argues that her treating physicians deserved credit and that the state agency physicians did not. First, she argues that the ALJ's conclusion that the blood clot was resolved in February 2006 [Tr. at 22] didn't consider Dr. Ansari's notes in the proper context. Rinehart contends that even though the evidence showed that the clot was resolved, Dr. Ansari's role was to continue Rinehart's treatment and to avoid future clots, so the ALJ read too much into Dr. Ansari's follow-up treatment that did not always discuss the ongoing pain. According to Rinehart, the ALJ should have instead given great weight to Dr. Ansari's January 8, 2009 letter where he stated that it would be difficult for Rinehart to work a steady eight hour shift. [Tr. at 336.]

This argument is unconvincing. The ALJ evaluated Dr. Ansari's records in their totality, and he simply wasn't convinced that they showed her impairment curbed all forms of work. He gleaned from Dr. Ansari's records exactly what they stated – that the clot was resolved, but Rinehart has difficulty standing, sitting, or walking for prolonged periods of time. And the RFC's limitations account for that difficulty.

The same is true of Dr. Graham's treatment records, which in Rinehart's view support the conclusion that she cannot sustain an eight-hour workday. [*See* Tr. at 108, 287-92, 300-01, 318-32.] Rinehart contends that Graham's treatment records shows that she's disabled because he changed her medications over time and his November 24, 2009 letter did not indicate improvement. [*See* Tr. at 108.] But as described above, Dr. Graham's treatment notes were a mixed bag. The ALJ took into account that Rinehart consistently reported pain to Dr. Graham, but didn't agree that his records showed that Rinehart is disabled. Namely, the ALJ noted that in 2007, Dr. Graham didn't provide specific work instructions; he simply stated that it would be "difficult" for her to sustain eight-hour

17

work days; and then on March 9, 2009, after Rinehart's most recent treatment before the hearing, Dr. Graham reported that her medications were consistent, she had some difficulty sitting or standing for long periods of time, and she had reasonable and functional range of motion. [Tr. at 23.] The ALJ's took these restrictions into account when he determined Rinehart's RFC.

Rinehart also points to Dr. Thomas Barbour's notes as well as those of her primary physician, Dr. Laura Hannon, contending that these physicians also support the conclusion that Rinehart cannot work an eight hour day. But again, the ALJ did take these records into account. As to Dr. Barbour, the ALJ considered his treatment records, concluding that they indicated that Rinehart "could perform work at the light exertional level with postural and hazard limitations." [Tr. at 24.] This was a proper reading of Dr. Barbour's records – he never states that Rinehart can't work an eight hour day.  And as to Dr. Hannon, the ALJ was unwilling to credit her after-the-fact conclusion because the majority of her contemporaneous treatment notes were to the contrary. As a result, I see no error in giving Dr. Hannon's final opinion less weight.

Finally, Rinehart contends that the ALJ should not have relied on Dr. Ruiz's March 3, 2007 conclusion because she only viewed a small portion of Rinehart's medical file and therefore was not equipped to properly assess her and make recommendations. [Tr. at 279-86.] Rinehart also suggests that the ALJ should not have concluded that Rinehart's treating physicians conclusions didn't support her position without considering additional information.  There are a number of problems with these arguments. First, Rinehart's position contradicts her argument that Dr. Barbour's January 30, 2007 assessment supports her position that she cannot work an eight hour day. Dr. Ruiz's report relied on Dr. Barbour's report to create her suggested limitations.  [Tr. at 281.].  It's contradictory for Rinehart to rely on Dr. Barbour's treatment notes to support her position, but then argue that the

18

ALJ should have discounted Dr. Ruiz's report that relied on those very same notes.

Moreover, Rinehart makes too much of the ALJ's reliance on Dr. Ruiz' report. The ALJ didn't simply adopt Dr. Ruiz's RFC in its entirety. Rather, he took into account Dr. Ruiz's suggestions, but also considered records indicating that Rinehart had difficulty standing or walking for prolonged periods of time after Dr. Ruiz's 2007 report. [Tr. at 25.] And Dr. Ruiz's suggested limitations contained fewer limitations than those the ALJ imposed – unlike Dr. Ruiz, the ALJ's RFC prohibited Rinehart from standing for more longer than one hour at a time. [Tr. at 25.] Because the ALJ considered medical records subsequent to Dr. Ruiz's determination in establishing Rinehart's RFC, the ALJ didn't err in considering her report as well as the subsequent medical information. *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) (stating that an ALJ is not required to rely on only one physician's opinion).

In sum, the ALJ reviewed the voluminous medical records in the case and based on those records decided to not give Rinehart's treating physicians controlling weight in establishing her RFC. This decision was supported by substantial evidence.

**3.       ALJ's Credibility Determination**

Rinehart's last argument is that the ALJ erred in not crediting her testimony. Because the ALJ is in the best position to evaluate credibility, I review an ALJ's credibility findings with deference and may not disturb the weighing of credibility so long as the determinations are not "patently wrong." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). To evaluate credibility, an ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p. The ALJ should consider objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and

19

medication taken, and "functional limitations." *See* 20 C.F.R. § 404.1529(c)(2)-(4); *Simila*, 573 F.3d at 517.  If the ALJ gives specific reasons for his credibility determination, which are supported by the record, his determination will stand.  *Murphy v. Astrue*, 496 F.3d 630, 635 (7th Cir. 2007).  But the ALJ may not "discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence."  *Simila*, 573 F.3d at 517.

Rinehart hasn't shown that the ALJ's assessment was patently wrong.  The ALJ found that Rinehart's "statements concerning the intensity, persistence and limiting effects of (her) symptoms are not consistent with or fully supported by the medical and evidence of record." [Tr. at 22.] The ALJ then went on to describe the medical evidence that he relied upon in arriving at that conclusion. According to Rinehart, the ALJ's credibility determination improperly ignored her subjective symptoms and was the type of perfunctory determination the Seventh Circuit has criticized.  *See Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010); *Spiva v. Astrue*, 629 F.3d 346 (7th Cir. 2010); *Martinez v. Astrue*, 630 F.3d 693 (7th Cir. 2011).  I disagree.

First of all, the cases Rinehart references condemning perfunctory credibility determinations involved fact patterns where the ALJ didn't make sufficient factual findings.  Rinehart cites *Parker v. Astrue*, where the Seventh Circuit criticized the ALJ's credibility conclusion using boilerplate language, where the "professionals who have examined [the claimant] were unanimous that she has severe, nearly constant, debilitating physical pain" 597 F.3d 920, 921-23 (7th Cir. 2010).  This situation is altogether different.   The record here doesn't involve unanimous statements by Rinehart's treating physicians that she cannot work.  Far from it.  Similarly, Rinehart cites *Martinez v. Astrue*, wherein the Seventh Circuit criticized the ALJ for making an adverse credibility determination against the claimant where the ALJ discussed very little of the evidence related to the

20

claimant's complaints of pain and fatigue.  630 F.3d 693 (7th Cir. 2011)**.**

In contrast to these cases, here the ALJ discussed the medical record in great detail.  For example, the ALJ noted that Rinehart testified that "she cannot work because of a blood clot which damaged her sciatic nerve and causes a constant, stabbing pain in her left leg"; "she takes morphine and Percocet for pain and that these medications make her sleepy and cause her to have a hard time driving"; and "she can only sit for 20 to 30 minutes; can only stand for 30 minutes; and can walk to only 15 to 20 minutes." [Tr. at 21.] Then the ALJ described her treatment, crediting much of her testimony but noting instances where the record showed that her condition was less severe and controlled with medication.  For example:

- In reviewing Dr. Ansari's treatment notes, the ALJ noted that Ansari reported in a February 14, 2006 letter that the claimant's clot had resolved and that she had only trace edema in her extremities (Exhibit 2F/10).

- Dr. Ansari reported that the claimant had mild pain on palpation of her left lower extremity in a November 14, 2006, treatment note with no edema (Exhibit 10F/3).

- Dr. Ansari's nurse reported that the claimant had no pain in her lower extremities and no edema, cyanosis or jaundice in a January 2, 2007, treatment note (Exhibit 10F/2).

- Dr. Graham noted that the claimant ambulated without antalgia and that she was encouraged to continue to ambulate and pursue activity without specific restriction.

- In a letter dated August 13, 2007, to the claimant's representative, Dr. Graham reported that he had not assigned any specific work restrictions to the claimant but said that because of her pain it would be difficult for her to perform any type of sustained eight-hour per day work (Exhibit 11F).

- On August 2, 2007, the claimant was noted to have four or five strength in her lower extremity, full range of motion on her left hip, and to ambulate without antalgia with the same examination findings reported on August 30, 2007, with the exception of a report that she had an antalgic gait.

- In the most recent treatment record dated March 9, 2009, Dr. Graham reported that the claimant is very stable on her medications.

- [T]he most recent treatment note from Dr. Ansari's office dated July 13, 2009, reported only minimal left lower extremity edema (swelling).

- Dr. Hannon's most recent examination record dated April 3, 2009, reported that the claimant had no edema (Exhibit 14F/1).

- The Administrative Law Judge noted that Dr. Barbour reported that the claimants range of motion was normal including the range of motion in her lower extremities.

[Tr. at 22-24.]

It's true that the ALJ's opinion doesn't explicitly state why her statements about the extent of her pain are not fully supported by each individual treatment record noted above, but the fact remains that the ALJ's conclusion was amply supported by substantial evidence. It's also true that the ALJ should have addressed Rinehart's testimony that the medications she takes makes it difficult for her to work. *See* 20 C.F.R. § 404.1529(c)(2)-(4). However, in reviewing the record, none of her treating physicians commented that Rinehart had difficulty working due to her medications, so the ALJ's failure to explicitly comment on the effect of Rinehart's medication doesn't make the credibility determination "patently wrong." *Simila*, 573 F.3d at 517. At the end of the day, the ALJ's review of the treatment record was sufficiently clear for me to conclude that he did not err. *Craft v. Astrue*, 539 F.3d 668, (7th Cir. 2008) (stating that a credibility determination "must be supported by evidence and must be specific enough to enable the claimant and reviewing body to understand the reasoning"). The ALJ's credibility determination is therefore affirmed.

**Conclusion**

The ALJ provided legitimate reasons for his opinion.  And while reasonable minds could differ, the only issue is whether the conclusion reached by the ALJ was supported by substantial evidence, *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004), and it was.  Accordingly, the decision of the ALJ is **AFFIRMED**.

**SO ORDERED**.

ENTERED: December 28, 2011.

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT